Good morning. We'll hear now United States v. Gonzalez numbers 16-1540 and 16-1559, as well as U.S. v. Matusowicz, and I'm sorry if I've butchered that. So we'll hear counsel now. Good afternoon, and may it please the court. My name is Taifa Harper, and I represent appellant David Matusowicz along with my co-counsel Edson Bostic. I respectfully request two minutes remoto, please. That will be granted. Thank you. Mr. Matusowicz's briefs raised several arguments as to why this court should reverse his convictions and vacate his sentence. I would like to focus on two of those arguments today. The first is that the lack of unanimity in this case violated Mr. Matusowicz's sixth amendment right to a unanimous jury. That's a well-chosen issue. It's a good one. But did you offer a unanimity instruction, which was rejected by the court? Did you ever request a unanimity instruction at trial? We did not, Your Honor. We are here on a plain error standard with respect to this issue. But I do note that in United States v. Russell, for example, this court has determined that the issue of unanimity is so fundamental that even under a plain error standard, it would require reversal. What difference would it make as to what are you saying should have been found unanimously? We are saying that the jury here should have been instructed that it had to be unanimous as to the actus reus element of the stalking statutes. For example, the second element of the statutes lists several different ways that a defendant may commit the actus reus element. For example, at the low end, it says that a defendant can commit the stalking with the intent to harass at the lower scale all the way to the intent to kill. So given that you have a statute that an essential element has varying degrees of behavior, we argue that the court here, it was incumbent upon the court to instruct the jury with respect to that actus reus. You're talking about state of mind, though. You're talking with intent to. Are you saying any time a statute says it has to have been negligent or reckless or willful or whatever, there has to be unanimity as to exactly what state of mind there was? No, Your Honor. In fact, the court said that in Navarro. What I'm saying here is that this particular statute, the interstate stalking and cyber stalking statutes speak of acts, acts that have intent. It says what places the person in reasonable fear causes substantial emotional distress. I mean, those are the real actus as compared to the mental state. That's what I'm speaking of, Your Honor, that the statutes, the actus reus here is that the defendant has to act with a certain intent. Yes, but this is not about the intent. It's the act. What difference would it make? Are you saying that the sentence would have been different if it places in reasonable fear versus causes substantial emotional distress? What difference does it make? Well, Your Honor, I believe that the actus reus issue touches on issues such as sufficiency. It touches on the issue of resulting in death. It touches on the sentencing issues. For example, if the jury determined, and we do not know what they determined, but if the jury determined that Mr. Matusiewicz committed stalking, say, for example, with intent to harass, that does bear on, for example, the resulting in death analysis. Because when we're thinking of resulting in death, when we're looking at how the court instructed this jury, the court said that Mr. Matusiewicz's actions have to have an independently sufficient connection to the result. Did you object to the causation instruction? No, Your Honor, we did not. Isn't the element here that the course of conduct that the jury has defined, and if it is the course of conduct, why can't we look at the totality of the circumstances here? I believe the court can look at the totality, but I believe that that analysis still requires the court to know what the act was. So, for example, this court has said in its opinions, ranging from Barrows to Russell and other cases, that the focus is on the defendant's conduct, his culpability. And so we're saying here that given that this is a stalking campaign that alleged multiple ways of committing these offenses. But they didn't, in this case, the government wasn't alleging multiple theories here. I'm sorry, Your Honor. Yeah, no. The government indicted in the conjunctive. So it's saying that Mr. Matusiewicz and the defendants committed stalking with all of these various, the acts with all of these various intents. At trial, the evidence did not come in that way. It was not an intent to kill trial. The government requested a disjunctive instruction. The district court said no, but permitted the government to argue in the disjunctive that the jury only had to find one of these acts. And what I'm saying is that when we don't know the act, that renders Mr. Matusiewicz's convictions unconstitutional. So what about the Schrader case from the Fourth Circuit? Do you agree with that, or is that wrongly decided? Well, I believe, Your Honor, if it's not in our circuit, it's wrong. But I would say that. Well, should we adopt it or not? No, and that was a bad joke, I admit. No, I'm not saying that Your Honor should adopt Schrader. I think in Gibson, for example, the Fifth Circuit illustrates this issue. There was a footnote, and when I reread it, and they gave the example of a traffic statute to simplify it a bit, but to make the point. And so in that statute, they said if a single statute has several different ways, for example, the defendant can be guilty of running a red light, the defendant can be guilty of driving without their lights on, the defendant can be guilty of speeding. Three jurors can determine that, yes, he was speeding, another three can determine that he was driving without his lights on, another three can determine, and so on and so forth, and still reach a guilty verdict. And that's what happened here. We literally have a scenario where because the jury is not instructed that it has to be unanimous with respect to the act, that three jurors could have found that this was, for example, intent to kill, that was the act. Three jurors could determine that this was intent to surveil. But I get back to the question of what difference does it make? Congress has said if any of those things happen, and it, the death of the victim results. So it really doesn't, it doesn't matter, does it? Because if any of these things, I mean, Congress could have said, you know, if it's intent to intimidate and it causes this, then this. If something else, then something else. But this statute is structured in a way that any of these things, if any of them are committed, and if death of the victim results, that's all we need to know. Well, I believe it matters, Your Honor, because unanimity is constitutionally required. Well, they were unanimous as to guilt. They were unanimous as to guilt, but we don't know the factual basis, the predicate, the act. My point is we don't need to know for purposes of the way the statute is structured. Well, Your Honor, I would respectfully submit that we do need to know, particularly in a case where we have the next step, which is resulting in death. And that next step requires the jury to look at the conduct to determine if the defendant's actions resulted in death. And so here, the difference is if they don't make that finding based on an act that we don't know, Mr. Matusso, it's a statutory maximum is five. But doesn't our Navarro decision deal with this, where we held the different mental states in statute are alternate means, not necessarily elements, as I think you're arguing? I think that the key part of the Navarro for me, at least in terms of as I read it and interpret it, is that the court there was saying, yes, we are looking at means as opposed to statutes that speak to different offenses. The key, though, is that in those cases, it's not talking about acts that are so morally disparate that one theory can fit all of the needs. Here, we have everything from harassment to intent to kill. And we submit that the jury should at least be unanimous as to which acts on a very central element was the basis for its verdict. Your Honor, did you have two issues? I do. Well, why don't we give you another minute to tell us about the other issue? Thank you, Your Honor. The second issue is that the family court opinion in this case terminating Mr. Matusowicz's parental rights not only provided a roadmap to the very issues before this jury, but it also was a full-on assessment of Mr. Matusowicz's character. Can you tell me exactly how this came in? As I understand it, there was an objection initially when it was proposed to be admitted. And then it was redacted. And after it was redacted, it went in without objection. Is that correct? That is not correct, Your Honor. During pretrial proceedings, the defense filed a motion to exclude the family court opinion. The government, in its omnibus motion and trial brief, said that the court orders, among other things, are intrinsic or either admissible under Rule 444B. We responded and said, no, this is not intrinsic and it is subject to Rule 444B and its limiting protections. The court order did not indicate or state whether it was allowing this evidence under Rule 403 or under Rule 444B, whether it determined that this evidence was intrinsic. So during trial, the defense continued to press the issue with respect to the family court opinion. In fact, pretrial, the defense offered to stipulate to what the government needed, and that was the fact that Mr. Matusowicz's parental rights were terminated by this court. That was the essential fact. But during trial, when it was offered and admitted, was there an objection by the defense? Your Honor, the defense made several objections during the course of trial with respect to not only the opinion but the testimony about the opinion. When we get to the portion of the record dealing with deliberations, the defense continued to make the objection and said, Your Honor, can you further redact the information that is speaking, for example, of Mr. Matusowicz's deceit? Now, the court did give a limiting instruction as to how the jury could view it. A couple, actually. Yes. The limiting instruction, as I read them, when I went back to read it, and not just the instruction but also the jury instruction, it speaks in a couple of different terms. So, for example, the limiting instruction is telling the jury that it's not automatically binding on you. The evidence is being offered for you to consider and make your own facts, find your own facts. But the instruction speaks in a couple of different ways. It speaks of language, for example, that is suggestive of intrinsic evidence, but then it also speaks in terms of 4.4.B. Well, it says you may use it in determining a defendant's state of mind, including knowledge, intent, and motive. Yes, Your Honor, but even with Rule 4.4.B evidence, the holdings of this court state that even if the evidence may, on the one hand, have a proper purpose, there's no link can relate back to the defendant's character. And here, you have a family court opinion that did just that. This wasn't just about terminating his rights. Before the family court, the court is deciding this evidence on a clear and convincing standard. Part of the family court analysis is to assess Mr. Matusiewicz's mental health and his character and his personality. Those are not issues that are before this court. The most important thing for this jury was that the family court terminated Mr. Matusiewicz's rights, and they found that his abuse allegations were not credible. Going back to Judge Randall's question, were there redactions? There were redactions, yes. The redactions extracted out the most serious, I would say, in terms of inflammatory statements. But what was still left were, for example, captions speaking of the father's negative attitude toward the mother, language that speaks of, for example, that Mr. Matusiewicz is willing to take risks, that he's an enormous risk-taker, that he has disconcerting personality traits, that he has the ability to be deceitful and manipulative, that he had a pattern of deceit, that he had a fragile mental state, that he had a distrust of anyone but his family, and that was a disturbing feature of his personality. So, yes, there were some redactions, but that information went back to the jury. They heard it, and when you request it to see it during the deliberations, the court allowed that opinion to go back over the defense's objections. All right. Thank you. We'll hear from you on the rebuttal. Thank you, Your Honor. Thank you. Good afternoon, and may it please the Court. My name is Jeremy Gonzalez-Ibrahim. I represent the appellant, Amy Gonzalez. Respectfully, I request the ability to reserve one minute in terms of rebuttal, if necessary. Okay. All right. That will be granted. Thank you, sir. The two arguments I would like to address before the Court today, and possibly three, but the two are the First Amendment issue, the second being the polygraph issue, and the third being cruel and unusual punishment. Your Honors, the First Amendment issue revolves around the use of my client's statements at trial in her speech, and her speech was largely greeting cards that she sent to Ms. Belford, a polygraph exam that she took and posted online. All of these things that we would submit represented her true and heartfelt viewpoint. Okay. The opposite to this was the government felt that these represented unprotected speech because they felt that it would lead to an exception, either defamation or speech integral to the commission of a crime. I'm not understanding your argument. Give me a case that stands for the proposition you're asserting. Judge, it's the general case law that covers First Amendment that we are submitting, that as applied, when you look at the statute, the statute essentially does not give a direct definition of what type of speech, so it leaves it for the courts to determine. So it's a vagueness. It's a vagueness and over-breath argument that we would be submitting, over-breath because when you look at the speech that was ascribed to Ms. Gonzalez, and speech such as the cards that were sent and the other bits of evidence, on their face they neither constitute true threats. On their face they don't seem to incite anyone. There's none of the traditional examples of what would be exceptions to protected speech. But here, speech is integral to criminal conduct. That was the claim as to a reason for the exception, and I would suggest that in order for... Well, it is, isn't it? Well, if you look at the speech, it now requires law enforcement to look at the speech and determine whether or not this speech, since it's not speech that says go do something criminal, it's actually speech that is very generic relating to legitimate issues. But because of that, it would be not integral to criminal conduct. Our sister circuits haven't viewed this argument too favorably, I take it. I agree, but the reason is when you look at the facts specifically of this case. I mean, much of the speech integral to criminal conduct are individuals talking about committing an actual crime. So their First Amendment protection is lost. I mean, in any case where you have someone telling someone to violate a municipal ordinance having to do with what could be sold and what can't be sold, they're actually speaking directly about a criminal offense. In our situation, there is no such discussion. What we have here is we do have speech. We have speech by virtue of a number of different ways. But none of that speech, if you look at it outside the confines of the case itself, would you say that this speech in and of itself, on its face, it's speech that's encouraging anyone to do anything criminal. And that is why the facts of this case, I would suggest, allow First Amendment protection to remain and not be removed under the claim that it is speech integral to criminal conduct. Defamation was also one of the exceptions that was claimed, that this was defamatory. A couple of points on that. There was much made at the trial, and I'm going to refer to the termination of parental rights that my colleague had mentioned in her argument that was admitted to the jury. And in the TPR, as we phrased it, there is reference to that the presiding state court judge, Judge Crowell, determined that the claims of sexual assault were untrue. What I would point out, that that TPR was issued in August of 2011. One of the documents that the government has alleged is proof of my client's speech integral to criminal conduct is a polygraph, and that will be addressed additionally in the second issue. But the polygraph was conducted in January of 2011. And when one looks closely at the TPR opinion, there's no mention of that polygraph. So to suggest that the defamation issue was one of the exceptions that would have allowed a protection to my client's First Amendment speech rights to be removed is ineffective because of that reason. There was no actual legitimate finding of defamation. And in fact, defamation in Delaware is a criminal, rather a civil tort, that would have required... Does there have to be a finding that there's defamation? I mean, are we looking at truth or falsity? I would suggest that the theory of the government's case, and it's reflected in their brief, that defamation was what they argued to the jury. I understand that, but there doesn't have to be a finding by another court. There doesn't have to be a finding from another court if the jury decides that they want to find that there's defamation. However, the defamation instruction in the record, we did raise the issue that we did request of the court to include some language that is consistent with how Delaware interprets defamation. Does it make any difference if the defendant's speech is integral to the defendant's conduct, unlawful conduct? Well, I would say that if it is in fact speech integral to criminal conduct, that that is one of the exceptions. So even if it wasn't defamatory, and it's questionable if it can't be, but let's say, in this particular case at least, if there was an appellate finding that it does qualify as speech integral to a criminal conduct, then that would remove any First Amendment protection. That's the argument that the government is advancing, and we're contending that when you look at the speech, it should not be permitted. If I may move on to the polygraph issue. In this case, there was, from beginning to end, the use in the government's case in chief of the polygraph that was previously referenced, taken in January of 2011, not only by my client, but one of the other defendants. That defendant shortly after trial passed away. The polygraph was in the indictment. Multiple copies of the polygraph were referenced throughout the entire record, and ultimately it was in evidence for the jury to consider during their deliberations. The issue with the polygraph became significant, because the government used that polygraph as a suggestion that it was merely a ruse by my client and her mother to, again, put out information about whether or not there was, in fact, abuse. Throughout the course of the trial, the defense disclosed the names of the experts, but we determined that we were not going to call an expert in terms of that particular polygraph. As the course of the trial went on, when it came time for the defense case, we determined that what would be appropriate for us to do is to... Didn't the government claim that you, in fact, told them representatively you wouldn't be moving into evidence at all? Well, no. Let me clarify that for the court, because the court is correct in its belief. Okay. The stage was that the government was clearly making reference to the polygraph. The polygraph was in the indictment. The actual polygraph was admitted into evidence. The government's position was that the questions that were asked of my client and her mother were questions that they were being restricted to certain questions. They weren't responding about some other claims that they had made. The government's position was that these claims were somehow... These questions were crafted to obviate another issue or another claim. The entire polygraph, therefore, was called into question when you look at the record, where it was clearly something that was a ruse. It went to, from the defense perspective, the issue of intent. So it wasn't the legitimacy of polygraphs, and it wasn't the issue of whether or not polygraphs are admissible, because, in fact, the government had a polygraph expert that was noticed. Ultimately, it was a circumstance where, on the defense case, the defense determined, may I continue, judges, and complete this argument? We'll give you another minute to... That's all right. Thank you. Okay. If I may. And what the defense did was we simply had another polygraph done, simply asking the questions... During the middle of trial. Toward the end of trial, correct. Are you going to say the district court abused its discretion in refusing to allow that during trial? Yes, and here's the reason. What supports that? During a trial, the district court, and this is a five-week trial, everything is done before trial. There's really no admission of evidence that is crafted, if you will, during a trial. I just have not heard of any support for that as an abuse. I would welcome that. Your Honor, it's a circumstance where it's not that evidence was created. Well, it was. You did a polygraph. We did a polygraph in response and in rebuttal to what we had no true understanding of what was going to be presented in the government's case in chief. We saw the indictment, but we had no way of knowing how many times that polygraph, the one that was taken in January of 2011, was going to be admitted, was going to be referenced, and the impact that was going to have on the appellant. At that point, we're in a situation where, as the court is aware, we have a constitutional right not to present any evidence. We determined that this is what we had to do, and that's why we did that. When you looked at the carefully crafted questions that were asked, they simply related back to the intent. But tell me how. I mean, you wanted to do that. You felt you had to do that. But tell me how that is an abuse of discretion on the part of the district court to say, I'm not going to allow that. Because it's a violation of my client's Sixth Amendment right to be able to mount a defense, that we had a situation where intent is key in this case as far as her involvement. And what was meant to show was not whether or not the information in the polygraph was legitimate, it was only that what was in her mind was her true belief. All right. Thank you, counsel. Let's hear from your adversary now. Thank you. May it please the court, J.D. McCall on behalf of the United States. I'm here with my colleague, Assistant U.S. Attorney Sean Weed. Given that the defendants have focused on some of the court issues that were briefed,  Starting with the unanimity argument that the defendants have made, it's the government's position that the primary legal principle of the jury just needs to be unanimous on each element of the offense, but not the means by which the offense is committed. Put differently, unless the element itself creates two different offenses, a specific unanimity instruction is not required. We've heard that with respect to element two of the cyberstalking statute, it's the defendant's position that both the mens rea component and the course of conduct somehow creates, in their assessment, different offenses. The government takes an opposing view. On the mens rea, does our Navarro case deal with this? Does this deal with the issue? Judge, we think the Navarro case precisely deals with the issue there. You have a money laundering statute, 1956, that has three mens rea components, promoting, avoiding, concealing, which this court has found do not, in and of themselves, create different offenses. They are merely an element, and the jury does not have to be unanimous as to how that specific element was offended. How about the acts? Either places the person in reasonable fear of death or serious bodily injury, or causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress. I mean, those are two acts. Does the jury have to be unanimous as to which one they find? No, Your Honor, for the same reason. Well, not the same reason. I mean, those are different acts. You're saying they're the same offense? Well, what I'm saying is that they have the – what the jury has to be unanimous on, Your Honor, is that the victim experiences one of those particular harms, but it doesn't have to be unanimous as to which harm it was. And I would note for the court that really the defendant's brief focused on either the mens rea or the course of conduct, not so much that component of the statute, but it's still the government's position that, nevertheless, that doesn't create two separate offenses, whether the victim suffered reasonable fear of death or substantial emotional distress. And I would note that if that were the case, it would create a unique situation where the government could charge this offense multiple, multiple times based on whatever two acts that it considered to be the course of conduct, and if it could somehow show that in this situation the victim had substantial emotional distress, in this situation the victim had fear of death, and it's really the government's position, the unit of prosecution in this offense is the victim itself, not the fear or the distress that the victim felt, but just was the victim impacted by the course of conduct that it was engaged in. I have a question. It hasn't been touched upon, but it has to do with the causation element. Do you agree that under the penalty provision, if death of the victim results, we have a but-for standard under the Supreme Court? Yes, Your Honor. But for this conduct, death would not have resulted? Yes, Your Honor. Now, with respect to Amy, do we have to find that but-for her specific conduct, death would not have resulted? Is that? So there were two theories upon which the jury could have found causation in this case. The first theory was that under Burrage, Paroline, that the defendant, in this case Amy Gonzalez, personally or jointly conducted herself in such a way that she caused the but-for cause and the proximate cause of Christine Belfort's death. And the second alternative way was Pinkerton. And under the Pinkerton theory, because the jury found Amy Gonzalez guilty of the conspiracy offense and because the jury found that Thomas Matuzowicz, who was a member of the conspiracy, had the actual and legal causation with respect to Christine Belfort's death, if that killing was within the scope of the conspiracy and if that killing was foreseeable to Amy Gonzalez, then she could be held responsible. I get that in a normal crime and a normal criminal statute. This one, though, has a penalty provision, a separate penalty provision. So conspiracy, guilt, everyone's caught up in it, okay, they're all guilty. I'm just-do you have anything that can help me say that when it comes to a penalty provision that is specific to a person who violates, that how the conspiracy theory really operates with a situation like this where it's a separate penalty provision that addresses each person who committed the crime? Well, I think, Your Honor, that under the theories that the court proceeded on, those were theories that flow from established Supreme Court precedent in the case, and I think that the court was correct to rely on that. Now, I would note, for Your Honor, that really, if I'm hearing you correctly, what you're asking is, was there sufficient evidence that Amy Gonzalez had committed herself in such a way that she was both the actual and possible cause? Yes, and we would submit that there was. I mean, again, this case, despite what the defendants said earlier, this case was all about both a stalking campaign and a murder plot. And for the government, we spent half the trial focusing on both the violent intentions of the members of the conspiracy, and that was reflected in the letters back and forth between Amy Gonzalez and her father, which were kept at her house. They were reflected in letters that said things like, we can't take much more getting slapped in the face than kicked in the teeth. I think it's about her turn, referring to Christine Balfour for that. My family fights back. And when you combine that evidence of violence with the luring of Christine Balfour to the courthouse, with Amy Gonzalez waiting in the wings, coming in the very next day to attempt to remove the girls and execute the final objective of the conspiracy, the government believes that the jury could have sufficiently found under either theory that she was both the but-for cause of Christine Balfour's death, the proximate cause, and under Pinkerton. Would you address the TPR? I actually found it troubling that this amount of external information, you know, was being brought in. Clearly the court said, you know, it's as to motive and intent, but it's very hard to read it without accepting some of the statements that are made there and are being enlightened by them, very different from the trial testimony. So what I would say, Your Honor, is, first of all, the TPR was admitted for a profit purpose, motive, knowledge, and intent. Why was that necessary? What did it add? It added it was the reason why he killed her in the end. The TPR did two things. First of all, the TPR took away from David Matuszewicz and his family the thing that they wanted most, the children. But more importantly, Your Honor, it's focused on the language, and that's understandable. The language of the order is what set him off. The language of the order is what made him want to kill her, and he did. Instead of being a stop sign, it became a trigger point, and that trigger point led to all this increased stalking activity in the weeks and months after the TPR order came down. I would note for the court that the evidence in the case did not just include the TPR order under Exhibit 308, but also a TPR order sent from David to Amy, found in Amy's house, where the key parts of the order had been underlined by the parties, showing this was what was argued in the jury, that this was really the catalyst for ultimately what became Christine Belfort's murder. Be specific on that. Are you talking about finding that there was no abuse, that they committed no abuse? So the exhibit is found at Exhibit 163, and it's 87-323 in the record, and the example to Your Honor would be, no sexual abuse occurred, double underlined. Was that redacted? And that was redacted, yes, Your Honor. Okay, so we don't see that. So, right, so that's not the focus. The focus of the appeal was on Exhibit 308. I raise this because Your Honor has indicated a concern with the language, so I'm identifying for the court why the language was important. Another piece of evidence that you have to read them together to understand why, again, the language was critical as a moment in time in the trial when the government was turning to the jury and saying, this is why they killed her. You're saying the TPR was actively used by the government, the language of the TPR, during the trial. So what I'm saying is, Judge, the government used the TPR precisely how the court indicated, and when we put that exhibit in front of the jury, what we said to the jury was, you are not to consider the TPR in terms of whether or not the sexual abuse occurred. You don't need to do that. We've already put all that evidence in front of you, including the child herself who came in and testified that no abuse occurred. You can use the TPR. You can look at this exhibit where they're double underlining the key parts to determine motive, knowledge, and intent. And did they see it during the trial? I mean, they asked for it in the deliberations. That's the first time the jury actually saw it. So the TPR order came in through one witness in the trial, and Your Honor was asking process questions. Came in through. Okay, it's admitted. When did the jury see it? During the testimony of Kim Lawson. They saw it. It was passed around. Well, it was published on a video screen, and it was generally reviewed by the government. But if I could just touch on the process of the TPR order, because I think it's very, very important. So the TPR order was litigated extensively before the district court, whether it was intrinsic, whether it was 404B, whether it satisfied 403. The trial court found that it was going to be admitted under Rule 404B as the motive, knowledge, and intent. The trial court indicated, however, that it was subject to redactions. And the defense attorneys in this case had every opportunity to make those redactions. There was no fighting over the redactions. If you go back and look at the testimony of Kim Lawson, it comes in without objection. Your colleague is saying that's not correct. Well, that's our position. I'd like a citation to the record for the fact that it is coming in without any objection during trial. So, Your Honor, I can provide the citation later. I would say that if you look, it comes in via Kim Lawson, and when the government is reviewing it, there's no objection by defense counsel that further redactions need to be made. That doesn't occur until after the close of the case. What I would also note, for Your Honor, is in addition to the language that goes to the motive, knowledge, and intent, the language of the TPR order in this case is incredibly important, because the central defense that's being waged by David Matusiewicz and his family is that the legal system, the Delaware Family Services has let them down, is not listening to them. They called an expert witness in the case, Jillian Blair, to come in and tell the jury that Delaware Family Services let them down, didn't follow their protocols, should have investigated, and the key part is the TPR order rebuts the central defense, and it's important to understand what claims are being raised by David Matusiewicz in the TPR hearing so that the jury is not misled into believing that this is some big mistake and he's out there just continuing to get someone to listen to help this child, when the reality is this issue was looked at, raised, decided, and it wasn't being used as propensity. It's being used, again, motive, knowledge, and intent, and to rebut a central defense that's being put forth by the defendant. That's why when we look at what Judge McHugh is doing and look at how the government was using, it can't be that given Judge McHugh's careful analysis of this, the redactions that were done, that he acted arbitrary or irrational when he was admitting this particular piece of evidence. What I would also say, Judge, is in addition to the instruction that the judge gave on this, as I understand it, he gave it more than once? He gave it more than once, Your Honor. He gave it when the evidence was admitted during Ken Watson's testimony, and then he provided the order again at the close of the final instructions. The government followed that order to a T during its closing argument. Even Judge McHugh noted that we complied with his order when we argued the TPR and its relevance and its place within this particular trial. I would also note, for Your Honor, an issue for Judge McHugh that the government raised in its briefing was that the government called all of the witnesses that testified at the TPR hearing at this trial, so the jury was able to decide for itself whether this singular issue of sexual abuse had occurred or not. The government put on overwhelming evidence that the child was not abused. She testified about this herself. Her medical providers, both her pediatrician and her mental health provider, came in and talked about the facts at issue. So the jury, unlike any of the cases at the defendant's side, the jury was able to, on its own, make this determination, and the government complied with this instruction, told the jury that they were specifically to do that. Don't use the TPR for an improper purpose. Use it for the proper purpose. Use it for when you're deciding why the defendants acted the way they did in this case. Your Honors, with respect to the polygraph that was raised by Defendant Gonzalez, we have a very different procedural take than the defendants do in this case. So going back, pretrial litigation, we had discovery deadlines, we had expert deadlines in this case. The government complied. Defendant Gonzalez initially indicated that she intended to call a polygraph expert and withdrew that request. The government then proceeded through trial, closed its case, and it wasn't until over three weeks into this trial, the night before we were headed back into court, that we found out that Defendant Gonzalez had conducted a secret polygraph of Amy Gonzalez, excuse me, of herself, that she intended to admit the following day. And so we went before Judge McHugh, we argued that this was a clear violation of the discovery deadlines, of the discovery rules in this case, and that under the case law it wasn't to be admitted. And Judge McHugh... Yeah, we reviewed that on abuse of discretion, right? Yes, Your Honor, that is under abuse of discretion. And what I think is important, the Sixth Amendment argument that Defendant Gonzalez raises, I would just note that there are reasonable restrictions that still apply on her right to make such a claim. And Judge McHugh, in denying their ability to put forth what essentially was a polygraph on a polygraph, found that under 403 it was conducted years after the fact. It was literally a polygraph on a polygraph. In fact, the government, because the polygraph had been conducted in secret and late, had no opportunity to participate in the process. It would have created a mini-trial. The defense could not overcome the Supreme Court case that was cited in the brief. And finally, I think the most important point was, in an attempt, and this is what Judge McHugh found, in an attempt to validate the findings of another expert, they could have called the polygrapher of the polygraph that they were using to torment Christine Belford, but they didn't have the confidence to do that. And so for those reasons, Judge McHugh denied their request to offer this evidence. And again, under the abuse of discretion standard, the government does not believe that that is sufficient to overturn the judge's decision. With respect to the First Amendment, the government would respectfully suggest that the claim that defendant Gonzalez is waging in this case is against the indictment. The trial evidence is not the issue based on how defendant Gonzalez styled her attack in the papers. So the court would then be left to the four corners of the indictment when it is assessing whether or not either an over-breath challenge is appropriate or whether an as-applied challenge is appropriate. We think that the sister circuits have it right, that they have been consistent in finding that over-breath does not apply because you have three distinct prongs of this statute, a mens rea prong, a course of conduct prong, and a impact on the victim prong. And because you need all of those three to satisfy all of those three prongs, it's not the case that you're going to sweep up a lot of, if any, protected speech. And on the as-applied front, the government would note simply that the speech in this case, based on the indictment in particular, was unprotected. It was either speech integral to criminal conduct or it was speech that constituted false and defamatory claims that were used in the harassment campaign. So I see that my time is up, Your Honors. If there's no questions, I will sit down. Thank you, Counsel. If I may, Your Honor, Judge Riddell, you asked the question, what did the TPR add to this case? And the TPR opinion added character. During pretrial proceedings, the defense offered to stipulate that, yes, the fact that Mr. Matusiewicz's parental rights were terminated and that the family court in doing so did not find that his claims were credible is admissible. We offered that stipulation. And one of the problems with the lack of full analysis by the district court is that in the United States, I believe it's general, this court said that when the defense offers to stipulate, that should be part of the court's analysis. Now, the government in its argument said that the language was the trigger. Pretrial, it said the act, the fact that his rights were terminated was the trigger. There was no allegation, either pretrial or during trial, that because the family court said Mr. Matusiewicz was deceitful or lying or manipulative that that's why he did these acts. The government's theory was that there was an escalation of conduct over time, that as certain things happened, Mr. Matusiewicz stepped on the gas. That's their allegation. So knowing that that's their theory, we said, fine, introduce the order, the fact that the court considered these allegations and rejected them. But you do not need findings that speak to his character. The government said that they called witnesses. They did. They called every single witness that was at the TPR, the family court hearing. They did not need. So why is that not enough? Because here you have. . . You don't have, you know, basically out-of-court statements. You have people in court who are the people who testified there. Why doesn't that do away with your challenge? Because, well, first you have a family court hearing this evidence on a much lower standard that's applied at the criminal trial process. Additionally, you have a family court going through those witnesses, going through that evidence and making its determination, but then it's also doing so in a way that is speaking not just that, hey, Mr. Matusiewicz, we don't believe your claims. It's also saying that we think you're a liar and a numerous risk-taker, manipulative, deceitful, and you distrust authority. So when we put forward to this court, to the district court and said, they can have the fact that his rights were terminated. They can argue the fact. They can introduce evidence that his rights were terminated. What they did not need was the evidence regarding his character, and we believe that that is improper under Rule 404B and it tainted this trial. Thank you. Thank you, counsel. Hello again, and briefly and quickly, inasmuch as this is a consolidated appeal, with respect to the TPR, the one thing I would ask the court to consider, while the government did call witnesses, they didn't call the authoring judge, and what was critical about that TPR was the conclusions that judge found. Now, wouldn't that have compounded the felony, so to speak?  That you're not supposed to accept what the judge found? If you put the judge on the stand, that's saying you're supposed to accept what the judge found. No, I agree. I'm saying that inasmuch as the witnesses were called, the witnesses testified about what information they had. What the jury got to view was what the judge concluded, and it was those conclusions coming from a state court judge that I would suggest had a greater impact and affected the appellants. The only other two items I'd like to address, there was, on rebuttal, there was discussion about letters exchanged between Ms. Gonzalez and other defendants. I would just ask the court to scrutinize the record. You will see that the letters came from the other defendants, and her replies were very much not consistent with someone other than a sister or a daughter receiving documents from a family member. Thank you, counsel. Thank you, Judge. We thank counsel for their excellent briefing and arguments in this tough case. We're going to take the case under advisory.